**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN SECTION**

**MONTERRIOUS HARRIS,**

    **Plaintiff,**

**vs.**                                                    **Case No. 2:23-cv-2058**

**CITY OF MEMPHIS,
EMMITT MARTIN III, DESMOND MILLS, JR.,
JUSTIN SMITH, DEMETRIUS HALEY,
TADARRIUS BEAN, and JOHN DOES 1-4,
INDIVIDUALLY, AND
IN THEIR OFFICIAL CAPACITIES
AS CITY OF MEMPHIS LAW
ENFORCEMENT OFFICERS,**

    **Defendants.**

---

**COMPLAINT FOR DAMAGES FOR DEPRIVATION OF CONSTITUTIONAL RIGHTS**

---

    **COMES NOW** Plaintiff Monterrious Harris, by and through undersigned counsel of record, pursuant to 42 U.S.C. § 1983, and files this Complaint against Defendant City of Memphis and against the following Defendants, in their individual and official capacities as Defendant City of Memphis Law Enforcement Officers: (1) Defendant Emmitt Martin III, (2) Defendant Desmond Mills, Jr., (3) Defendant Justin Smith, (4) Defendant Demetrious Haley, (5) Defendant Tadarrius Bean, and (6) John Does 1-4 (collectively referred to hereinafter as "Defendants").  In support of the Complaint, Plaintiff states as follows:

## I.      **INTRODUCTION**

In recent years alone, an examination of Defendant City of Memphis' and the Memphis Police Department's law enforcement practices paints a painful and sordid picture of its police force assaulting, abusing, and trampling the constitutional rights of the very citizens it exists to protect and serve.  All of these stories share a familiar and unfortunate theme – the Memphis Police Department continually and brazenly disregarding the constitutional rights of the citizens of Memphis, Tennessee through a slew of unlawful, heinous, and nefarious customs and practices. This case is now among these stories.

In 2011, Defendant City of Memphis law enforcement officers aggressively beat, kicked, stomped, choked, and unlawfully arrested two (2) young African-American men at the corner of Beale Street in downtown Memphis, after which it was revealed that the accosting officers were intoxicated, having engaged in a decades-long police custom known as "choir practice."  Choir practice involved officers remaining at their precincts after their shift ended to collectively engage in the consumption of alcohol; however, they were allowed, and were expected, to respond to calls even while knowingly intoxicated. In 2011, Michael McDonald ("Mr. McDonald") and Quentin Lytle ("Mr. Lytle") were victims of this unconstitutional practice and custom, when they were beaten by a group of intoxicated Memphis Police Department law enforcement officers because they were black men walking with white women after an evening spent in Downtown Memphis.

Mr. McDonald and Mr. Lytle subsequently filed a lawsuit to end "choir practice."  Before the completion of the case, the Sixth Circuit Court of Appeals formally castigated Defendant City of Memphis for improperly seeking the protection of "qualified immunity" by filing appeals that "were so clearly futile and apparently prosecuted for improper purposes […] that sanctions [were]

warranted."   After that admonishment, Defendant City of Memphis resolved the litigation. Nevertheless, unconstitutional policing practices in Memphis would continue.

Case in point, in 2015, Defendant City of Memphis had its policy and practice of unconstitutionally seizing, assaulting, and falsely arresting citizens on Beale Street put to an end when it was brought to light by a jury verdict in federal court. Following the jury verdict, the United States District Court for the Western District of Tennessee issued a permanent injunction against the Defendant City of Memphis, enjoining it from continuing these practices and ordered City-wide training of Memphis Police Department law enforcement officers regarding unconstitutional and unlawful uses of police power.  The Court also appointed a monitor to report on the progress of the constitutional re-training.   Nevertheless, unconstitutional policing in Memphis would continue.

In 2018, the United States District Court for the Western District of Tennessee found that Defendant City of Memphis' law enforcement officers had violated a 1978 consent decree between the Americans Civil Liberties Union and Defendant City of Memphis, which prohibited Defendant City of Memphis and its agents from unconstitutionally spying on and surveilling citizens. Defendant City of Memphis' explanation that it was merely collecting "political intelligence" was flatly rejected.  Once again, a monitor was appointed to report on the re-training progress.  After the Court's ruling, Memphis' Police Department's Chief declared that the "Memphis Police Department has been proactive in our approach by putting methods in place, prior to the ruling, to ensure that we stay within the limits of the decree.  We look forward to working with the court to ensure compliance."  Defendant City of Memphis also issued a statement, noting that the "Court believes that we can do better, and we agree."  Nevertheless, unconstitutional policing in Memphis would continue.

The foregoing, non-exhaustive examples of Defendant City of Memphis' unconstitutional treatment of citizens through the customs and practices of the Memphis Police Department are but mere snapshots of the abuses that have continually occurred over the last decade. The foregoing cautionary tales do not include the multitude of victims of police violence whose voices and accounts were never heard in a courthouse, in the public forum, or on a screen.

Unfortunately, civil judgments, permanent injunctions, appointment of court monitors, and mandated constitutional re-training have not been effective in curtailing Defendant City of Memphis' unconstitutional policing, as its abuses of citizens through policing remains unabated and has now reached a new level of shocking depravity. Indeed, just weeks ago, a promising, young African-American man named Tyre Nichols ("Mr. Nichols") lost his life at the hands of Memphis Police Department brutality in an unspeakable tragedy, capturing the attention of the nation and beyond.

While his violent and untimely death can never be justified, Mr. Nichols' indefensible suffering has brought Defendant City of Memphis' latest constitutional abuses out of the darkness and into the light, igniting a fire to completely – and perhaps finally – expose and extricate police abuses in Memphis. Like a grain of wheat, Mr. Nichols fell to the earth and died; but his death is hopefully slowly bearing fruit.

In the midst of these events, one (1) fruit borne of Mr. Nichols' solitary death is the exposure of another brutal Memphis Police Department encounter with yet another young, African-American Memphian named Monterrious Harris ("Mr. Harris"). This lawsuit is Mr. Harris' account of the unconstitutional abuse and suffering at the hands of the very same police unit that extinguished the life of Mr. Nichols.

Just three (3) days prior to Mr. Nichols' fatal encounter with the Memphis Police Department's "Scorpion Unit," Mr. Harris was beaten and otherwise abused by the same Scorpion law enforcement officers.  In the evening hours of January 4, 2023, Mr. Harris, while visiting his cousin at an apartment complex in Memphis, was suddenly swarmed by a large group of assailants wearing black ski-masks, dressed in black clothing, brandishing guns, other weapons, hurling expletives and making threats to end his life if he did not exit his car.  Unknown to Mr. Harris at the time – the black masked assailants were members of the Scorpion Unit.  Not once did any member of the Scorpion Unit identify himself as a police officer. Mr. Harris – believing himself to be a victim of a car-jacking – panicked and attempted to reverse his vehicle, striking an object located behind his vehicle prior to exiting his vehicle with his hands raised.  Consistent with the beating visited upon Mr. Nichols, the Scorpion Unit then exacted a swift, violent, and continuous physical assault on Mr. Harris that included punching, stomping, and dragging him across concrete.  Fortunately, residents of the apartment complex heard the loud shouting and noise and came outside to investigate.  In all likelihood, the presence of these Good Samaritan witnesses prevented further harm to Mr. Harris.

After their violent assault was interrupted by witnesses, the Scorpion Unit arrested Mr. Harris, took him into custody, and filed a host of false criminal charges against him.  The only crime Mr. Harris had committed was being young and African American.  It was not until he arrived at the criminal justice center that an on-duty nurse ordered that he be taken to the hospital for emergent medical observation and treatment. Fortunately, unlike Mr. Nichols, Mr. Harris survived his encounter with the Scorpion Unit and is alive and able to recount the events.

It appears that the avalanche of publicity following the death of Mr. Nichols, caused Defendant City of Memphis to permanently disband the Scorpion Unit.  The same five (5)

members of the Scorpion Unit who assaulted and beat Mr. Harris have now all been indicted by Shelby County, Tennessee's District Attorney and charged with Second Degree murder and other crimes stemming from the death of Mr. Nichols.

The current ignoble chapter of the Memphis Police Department ending with the violent and unconstitutional beatings of Mr. Harris, other Memphians and the death of Mr. Nichols, began decades ago. The Memphis Police Department unconstitutional policies, practices, and customs leading to the formation of the Scorpion Unit, which operated as a gang of vigilantes, was consistent with abuses that citizens have suffered for many years.

## II.   **PARTIES**

1.     Plaintiff Monterrious Harris ("Plaintiff" or "Mr. Harris") is an adult resident of Memphis, Shelby County, Tennessee.  Mr. Harris is a veteran, as he served in the United States Army.

2.     Mr. Harris is approximately 5'10 and weighs 145 pounds.

3.     Defendant City of Memphis is a municipal entity located in Shelby County, Tennessee, recognized by the State of Tennessee as a properly organized and legal municipal entity and can be served with process through its City Attorney, Jennifer Sink, Esq., at her office located at 125 North Main, Suite 336, Memphis, Tennessee 38103.

4.     At all times relevant hereto, Defendant Emmitt Martin III ("Defendant Martin") was an employee and officer of the City of Memphis and was also a member of the Memphis Police Department's Scorpion Unit. Upon information and belief, Defendant Martin can be found at 201 Poplar Avenue, Memphis, Tennessee 38103 for service of process. Defendant Martin is being sued in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions or inactions taken by him individually.

6

5.      At all times relevant hereto, Defendant Desmond Mills, Jr. ("Defendant Mills") was an employee and officer of the City of Memphis and was also a member of the Memphis Police Department's Scorpion Unit. Upon information and belief, Defendant Mills can be found at 201 Poplar Avenue, Memphis, Tennessee 38103 for service of process. Defendant Mills is being sued in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions or inactions taken by him individually.

6.      At all times relevant hereto, Defendant Justin Smith ("Defendant Smith") was an employee and officer of the City of Memphis and was also a member of the Memphis Police Department's Scorpion Unit. Upon information and belief, Defendant Martin can be found at 201 Poplar Avenue, Memphis, Tennessee 38103 for service of process. Defendant Martin is being sued in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions or inactions taken by him individually.

7.      At all times relevant hereto, Defendant Demetrious Haley ("Defendant Haley") was an employee and officer of the City of Memphis and was also a member of the Memphis Police Department's Scorpion Unit. Upon information and belief, Defendant Haley can be found at 201 Poplar Avenue, Memphis, Tennessee 38103 for service of process. Defendant Haley is being sued in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions or inactions taken by him individually.

8.      At all times relevant hereto, Defendant Tadarrius Bean ("Defendant Bean") was an employee and officer of the City of Memphis and was also a member of the Memphis Police Department's Scorpion Unit. Upon information and belief, Defendant Bean can be found at 201 Poplar Avenue, Memphis, Tennessee 38103 for service of process. Defendant Bean is being sued

in both his official capacity as an officer of the Memphis Police Department and in his individual capacity for actions or inactions taken by him individually.

9.     At all times relevant hereto, Defendant John Does 1-4 ("Defendant John Does") were all employees and law enforcement officers of Defendant City of Memphis and were also members of the Memphis Police Department's Scorpion Unit. Upon information and belief, Defendant John Does can be found at 201 Poplar Avenue, Memphis, Tennessee 38103 for service of process. Defendant John Does are being sued in both their official capacities as officers of the Memphis Police Department and in their individual capacities for actions or inactions taken by them individually.

### III.   JURISDICTION AND VENUE

10.     Jurisdiction of this Court is invoked pursuant to 42 U.S.C. § 1983.

11.     The acts and omissions described in the body of this Complaint all occurred in Memphis, Shelby County, Tennessee and venue is appropriate in this judicial district pursuant to 28 U.S.C § 1391.

12.     The jurisdiction of this lawsuit is proper in the United States District Court for the Western District of Tennessee, Western Section. Jurisdiction lies with this Court pursuant to 28 U.S.C. §§ 1331, 1343 and 1367.

### IV.   STATEMENT OF FACTS

#### A.  Memphis Police Department's Prior Unconstitutional Practices

##### i.     Choir Practice

13.     On or about July 4, 2011, numerous Defendant City of Memphis employees and Memphis Police Department law enforcement officers brutally beat, stomped, choked, invented false charges, and then unlawfully arrested two (2) African American Memphians named Michael

McDonald and Quinten Lytle, while they were leaving Beale Street at approximately 2:00 a.m. with their girlfriends, who happened to be white women.

14.     Mr. McDonald and Mr. Lytle had committed no crimes, were not reasonably suspected of committing any crimes, and did not provide the law enforcement officers who violated their respective constitutional rights with any reason to stop them.  Mr. McDonald nor Mr. Lyle did anything to provoke the beatings that they received.

15.     Indeed, the only "crime" Mr. McDonald and Mr. Lyle were guilty of committing was being in the company of white women, as immediately before Mr. McDonald and Mr. Lytle were assaulted by Memphis Police Department law enforcement officers, they were told "take your snow bunnies and keep it moving."

16.     Every Memphis Police Department law enforcement officer who brutally beat and assaulted Mr. McDonald and Mr. Lytle were intoxicated.  Below is a photograph illustrating some of the injuries sustained by Mr. McDonald:



17.    At the time that Mr. McDonald and Mr. Lytle were assaulted, Defendant City of Memphis and the Memphis Police Department had a policy, practice, and custom in which its law enforcement officers were permitted to consume alcoholic beverages while they were still on-duty and were expected and permitted to exercise police authority, including, but not limited to, effectuating arrests. The policy, practice, and custom was referred to as "choir practice."

18.    Mr. McDonald and Mr. Lytle filed a lawsuit against Defendant City of Memphis and the individual law enforcement officers who assaulted them in the United States District Court for the Western District of Tennessee, Civil Action No.2:12-cv-2511. After surviving summary judgment, Defendant City of Memphis settled the matter on the eve of trial, paying Mr. McDonald and Mr. Lytle a monetary sum and their attorneys' fees.

19.    No Memphis Police Department law enforcement officers were disciplined who participated in choir practice.

20.    No Memphis Police Department law enforcement officers were disciplined for their conduct in the incident involving Mr. McDonald and Mr. Lytle.

21.    All of the foregoing facts pertaining to "choir practice" are public record and are easily verifiable.

**ii.    Beale Street Sweep**

22.    Since at least 2007, Defendant City of Memphis had an unconstitutional policy, procedure, custom, and practice of ordering all persons standing on streets within the Beale Street Entertainment District to immediately leave the Beale Street Entertainment District and/or vacate the streets by going into an establishment, such as a restaurant.  This practice was referred to as the "Beale Street Sweep."

23.   The Memphis Police Department would routinely perform the Beale Street Sweep during the evening hours and the early morning hours when the Beale Street Entertainment District was populated with largely African American Memphians and tourists.

24.   Defendant City of Memphis conduced the Beale Street Sweep irrespective of whether circumstances existed which threatened the safety of the public or Memphis Police Department law enforcement officers.

25.   The Memphis Police Department did not perform the Beale Street Sweep peacefully and non-violently.   To the contrary, the Memphis Police Department would aggressively and violently "sweep" the Beale Street Entertainment District.

26.   In the performance of the Beale Street Sweep, the Memphis Police Department would routinely assault, use excessive force, detain, and arrest individuals for doing nothing but standing on the sidewalk. After assaulting them, the Memphis Police Department would then fabricate charges against them.

27.   On August 26, 2012, the Memphis Police Department performed the Beale Street Sweep when an African American off-duty Memphis Police Department law enforcement officer dressed in civilian clothing named Lakendus Cole ("Mr. Cole") was standing on Beale Street.

28.   Mr. Cole was standing on Beale Street waiting in line to purchase a slice of pizza when the Memphis Police Department ordered all individuals in the Beale Street Entertainment District to immediately vacate the street.   However, Mr. Cole did not hear that unconstitutional demand.

29.   Shortly after Mr. Cole purchased his slice of pizza, Memphis Police Department law enforcement officers approached him and stated "didn't we tell you to get off the street?"

30.     Before Mr. Cole could respond or inform them that he was an off-duty Memphis Police Department law enforcement officer, he was grabbed, assaulted, beaten, and attacked by the law enforcement officers "sweeping" Beale Street. Indeed, Mr. Cole's body was slammed into a Memphis Police Department vehicle twice with such force that the impact dented the vehicle.

31.     After the beating, Mr. Cole was handcuffed and taken to jail.

32.     To justify Mr. Cole's arrest, the Memphis Police Department fabricated an affidavit of complaint and manufactured charges against him, still not knowing that he was actually an off-duty Memphis Police Department law enforcement officer.

33.     Mr. Cole was charged with vandalism, disorderly conduct, and resisting arrest.

34.     On February 25, 2013, Mr. Cole filed suit in the United States District Court[1] for the Western District of Tennessee against the Defendant City of Memphis, alleging that he was unlawfully arrested and that excessive force was utilized during his arrest.  More broadly, he alleged that Defendant City of Memphis had a custom and practice of violating the constitutional rights of individuals within the Beale Street Entertainment District and that the Beale Street Sweep was unconstitutional.  He demanded that the Court permanently enjoin Defendant City of Memphis from performing the Beale Street Sweep.

35.     Mr. Cole prevailed at trial.

36.     The Court permanently enjoined Defendant City of Memphis from performing the Beale Street Sweep, declaring that it was an unconstitutional custom and practice of Defendant City of Memphis.

37.     The Court also ordered that Memphis Police Department law enforcement officers undergo training regarding how to lawfully police in the Beale Street Entertainment District.

---

[1] Civil Action No. 2:13-cv-021117.

38.    In addition, the Court appointed a monitor to oversee the training and to observe the progress of the institution of new constitutional police policies and practices within the Beale Street Entertainment District.

39.    For some reason, Defendant City of Memphis appealed the jury verdict.  However, the Sixth Circuit Court of Appeals affirmed.

40.    No Memphis Police Department law enforcement officers were disciplined who participated in the unconstitutional Beale Street Sweep.

41.    All of the foregoing facts pertaining to the Beale Street Sweep are public record and are easily verifiable.

### iii.    Unconstitutional Monitoring of Citizens Who Protested the Memphis Police Department's Killing of a Black Man

42.    In 2018, the United States District Court for the Western District of Tennessee found that Defendant City of Memphis violated a 1978 Consent Decree between Defendant City of Memphis and the American Civil Liberties Union.

43.    Specifically, the Court found that the Memphis Police Department was unlawfully spying on certain Memphians who protested in the aftermath of an African American teen being murdered by the Memphis Police Department. The Court also found that Defendant City of Memphis was intercepting the electronic communications of certain protestors and infiltrated groups to which they belonged using deceptive means.

44.    No Memphis Police Department law enforcement were discipled who participated in the unconstitutional monitoring.

45.    All of the foregoing facts pertaining to this matter are public record and easily verifiable.

**B. Memphis Police Department's "Scorpion Unit"**

46.     At all relevant times thereto, the Memphis Police Department employed a collection of Memphis Police Department law enforcement officers that it named the "Scorpion Unit." The Scorpion Unit purportedly stood for "Street Crimes Operation to Restore Peace in Our Neighborhoods."

47.     Upon information and belief, the Memphis Police Department launched the Scorpion Unit in or around October or November 2021.

48.     The Scorpion Unit was mainly comprised of law enforcement officers with less than five (5) years of experience with the Memphis Police Department, and upon information and belief, as little as two (2) years of experience.

49.     The Scorpion Unit was allowed to police the streets of Memphis without supervision.

50.     The Scorpion Unit was allowed to police the streets of Memphis without proper training.

51.     The Scorpion Unit only patrolled neighborhoods which were composed of primarily African-Americans.

52.     At all times relevant hereto, Defendant Martin, Defendant Mills, Jr., Defendant Smith, Defendant Haley, Defendant Bean, and Defendant John Does (hereinafter collectively referred to as "Individual Defendants") were all members of Memphis Police Department's Scorpion Unit.

53.     The Memphis Police Department law enforcement officers who comprised the Scorpion Unit received no training to effectuate any lawful initiative that the Scorpion Unit was ostensibly constituted to accomplish and/or achieve.

54.    Upon information and belief, Defendant City of Memphis directly retained and employed the law enforcement officers who comprised the Scorpion Unit.

55.    Upon information and belief, the law enforcement officers comprising the Scorpion Unit had a history of criminal and/or violent behavior.

56.    Upon information and belief, Defendant City of Memphis granted criminal waivers to the law enforcement officers comprising the Scorpion Unit.

57.    Upon information and belief, Defendant City of Memphis retained and employed the law enforcement officers who comprised the Scorpion Unit despite their objective lack of qualifications, education, and/or other typical prerequisites for a Memphis Police Department law enforcement officer.

58.    Since its organization, the Scorpion Unit has terrorized numerous citizens, especially African-American men, in communities throughout the City of Memphis.  Specifically, at all times relevant hereto, the Scorpion Unit marauded around African-American neighborhoods and harassed citizens by performing suspicion-less custodial and automobile stops for which there were no legal justifications.

59.    With respect to automobile stops, the Scorpion Unit's *modus operandi* was to target and stop young black men without any legal justification. The Scorpion Unit would then draw their firearms, surround the "suspects'" vehicles, yell expletives and racial slurs at them, and then demand that they exit the vehicle or risk being shot. After these young black men exited their vehicles, an assault would commence, as the Scorpion Unit, without any legal justification, would begin to physically assault, pummel, tase, and point their firearms in the faces of the young black men who lived in neighborhoods in which the Scorpion Unit patrolled, despite the fact that they

had committed no identifiable crimes, had not been genuinely been suspected of committing a crime, and had not resisted any lawful command.

60.     In order to shield its actions from public and/or legal scrutiny or detection, the Memphis Police Department trained the law enforcement officers who were part of the Scorpion Unit to remove or reposition their body cameras during each stop, and/or to yell commands to give the false appearance that the young black male occupants of the vehicles were resisting detainment or otherwise not complying with lawful commands, when, in fact, they were being pummeled, beaten, and kicked for no legally justifiable reason.

61.     The Memphis Police Department also trained the law enforcement officers who were part of the Scorpion Unit to falsify affidavits of complaint which normally accompanies an arrest and sets forth the factual basis for the detainment and criminal charges.  Specifically, in its affidavits of complaint, the Scorpion Unit's officers would routinely invent out of whole cloth and swear, under oath, to a set of facts that bore no semblance to what had actually occurred.  The affidavits of complaints submitted to judicial officers by the Scorpion Unit were routinely complete fabrications.

62.     Although the Scorpion Unit masqueraded as a tactical unit of the Memphis Police Department, in actuality, the Scorpion Unit was a group of violent aggressors, employed by the Memphis Police Department, to terrorize African-American communities in Memphis, Tennessee.

63.     Many of the young black men who were stopped by the Scorpion Unit required medical attention after their encounters to treat serious physical, emotional, and mental injuries sustained by them.

64.     The Scorpion Unit committed all of their actions, which were, in actuality, criminal and with impunity, as its actions were authorized and ratified by the Memphis Police Department

16

and Defendant City of Memphis.  The Scorpion Unit was not a rogue unit or a unit comprised of a "few bad apples."   All of its actions were performed at the behest of the Memphis Police Department and Defendant City of Memphis.

65.    All of the Scorpion Unit's actions were officially authorized, endorsed, and sanctioned by Defendant City of Memphis and the Memphis Police Department.

**C.  The Scorpion Unit Bludgeons and Kills Tyre Nichols**

66.    One of the neighborhoods in which the Scorpion Unit was tasked with "policing" was the Hickory Hill community, which is composed of primarily African-American residents.

67.    Tyre Nichols was a twenty-nine-year-old resident of the Hickory Hill community, who worked at Federal Express and enjoyed, *inter alia*, photography and skateboarding.   Mr. Nichols also was a father to a four-year-old son and was a devoted family man.

68.    On January 8, 2023, after leaving Shelby Farms Park where he was taking photographs of the Memphis sunset, Mr. Nichols attempted to head home to eat dinner with his mother.

69.    When Mr. Nichols was approximately two (2) blocks from his house, he was stopped by the Scorpion Unit, including, but not limited to, Defendant Martin, Defendant Mills, Jr., Defendant Smith, Defendant Haley, Defendant Bean, and Defendant John Does.

70.    The Scorpion Unit only stopped Mr. Nichols because was a young African American.

71.    The Scorpion Unit did not have a legal basis to stop Mr. Nichols.

72.    Mr. Nichols had not committed any crimes and/or traffic violations.

73.    Mr. Nichols stopped his vehicle immediately after the Scorpion Unit's law enforcement officers activated the emergency lights on their vehicles.

74.     Upon stopping his vehicle, Mr. Nichols was aggressively yanked out of it by multiple members of the Scorpion Unit despite the fact that he had not resisted, ignored, or disobeyed any lawful command.

75.     Subsequently, the Scorpion Unit beat Mr. Nichols so severely that he was unrecognizable. The injuries sustained by Mr. Nichols at the hands of the Scorpion Unit, including, Defendant Martin, Defendant Mills, Jr., Defendant Smith, Defendant Haley, Defendant Bean, and Defendant John Does ultimately killed him.

76.     During the unprovoked brutal attack of Mr. Nichols, the Scorpion Unit, consistent with its *modus operandi*, yelled numerous instructions to Mr. Nichols in a coordinated attempt to make it appear that he was resisting lawful commands and that the Scorpion Unit's actions were legally justified. In addition, the Scorpion Unit also disabled, turned off, removed, or repositioned their body cameras so that Mr. Nichols' beating was not accurately captured on their body cameras.

77.     Based on information and belief, the narrative provided in the affidavit of complaint pertaining to Mr. Nichols contains patent falsehoods, as it alleged that he was suspected of committing an aggravated assault.  However, Mr. Nichols had committed no such crime.

78.     At all relevant times, the Scorpion Unit had no reason whatsoever to suspect that Mr. Nichols had even committed any aggravated assault.

79.     Indeed, but for there being a camera across the street from the area in which Mr. Nichols was attacked by the Scorpion Unit, it is extremely likely that the entire ordeal would have gone completely undetected and undisciplined.  In fact, a review of the videotape that captured the attack that led to Mr. Nichol's death reveals that the Scorpion Unit and the Individual Defendants had no remorse or empathy for Mr. Nichols as he lay on the street dying from injuries they proximately caused. As Mr. Nichols lay on the concrete after the beating, the Scorpion Unit

bragged about how badly they had beaten Mr. Nichols.  The Scorpion Unit's behavior was abhorrent.

80.     Had there been no other camera footage of the beating, Mr. Nichols would have been known only as another young black man who simply died during a police encounter, where, as usual, the law enforcement officers were the sole historians of events.

81.     On January 10, 2023, three (3) days after his January 7, 2023 encounter with the Scorpion Unit, Mr. Nichols succumbed to the injuries he sustained in the traffic stop and died.

**D.  The Scorpion Unit is Permanently Disbanded; Defendants Martin, Mills, Jr., Smith, Haley, and Bean are Arrested**

82.     Due to the fact that the Scorpion Unit did not know that its traffic stop with Mr. Nichols was captured by a video camera across the street from where it occurred, it did not confiscate the video tape.  Thus, the footage of the events that led to Mr. Nichols' killing was accessible.  The video footage, which was eventually released to the public, reveals that Mr. Nichols was a victim of a severe and unprovoked beating at the hands of the Scorpion Unit.

83.     Due, in large part, to public outcry, Defendant Martin, Defendant Mills, Jr., Defendant Smith, Defendant Haley, Defendant Bean were arrested and charged with second degree murder, aggravated kidnapping, official misconduct and official oppression, all crimes which were committed against Mr. Nichols.

84.     Also, in response to public outcry, Defendant City of Memphis and the Memphis Police Department permanently disbanded the Scorpion Unit on or about January 26, 2023.

**E.  The Scorpion Unit's Brutal Attack on Mr. Harris Without Legal Justification**

85.     On January 4, 2023, or three (3) days before the Scorpion Unit killed Mr. Nichols, Mr. Harris had a life-altering run in with the Scorpion Unit.

19

86.     Mr. Harris is a twenty-two (22) year-old Memphis, Tennessee citizen who also lives in the same Hickory Hill community as Mr. Nichols.

87.     Upon graduating from Wooddale High School, Mr. Harris enlisted in the United States Army.  Due to a medical issue, Mr. Harris was medically discharged 2-3 years later.

88.     Mr. Harris is a United States Army Veteran who served his country.

89.     On January 4, 2023, after a difficult day, Mr. Harris traveled to the Twin Oaks apartment complex to pick up his cousin before they headed to a park in downtown Memphis, Tennessee.

90.     Mr. Harris wanted to speak to his cousin and confidant about personal matters.

91.     Upon arriving at the apartment complex, Mr. Harris' cousin hopped in his vehicle while carrying his licensed and registered firearm.

92.     Unbeknownst to Mr. Harris, his cousin secured the firearm between his seat and the middle console.

93.     At no time did Mr. Harris even know that his cousin was armed or that there was a firearm in his vehicle.

94.     Mr. Harris spoke with his cousin for approximately 4-6 minutes until his cousin exited the car to run back inside to grab a jacket and change shoes before they headed downtown.

95.     When his cousin went back inside his apartment, Mr. Harris began to back into a parking space.

96.     Within seconds of backing into a parking space, five or six masked men approached and surrounded his vehicle brandishing pistols and demanding that he exit the car or "be shot."

97.     Since the men were wearing black ski-masks that covered their faces and Memphis Police Department paraphernalia was not immediately apparent or visible, Mr. Harris reasonably concluded that he was being robbed.

98.     None of the men wearing black ski-masks who approached Mr. Harris' vehicle asked him for his license, vehicle registration, or advised him of the reason they had surrounded his vehicle.

99.     The men wearing black ski-masks swore at and hurled racial epithets at Mr. Harris.

100.    Instinctively, Mr. Harris began to back away from men in black ski-masks, bumping into an obstruction that was approximately 5-10 feet behind his vehicle.

101.     After his vehicle collided with the obstruction, Mr. Harris reluctantly exited his vehicle with his hands in the air hoping that the men in black ski-masks would not shoot him and would simply take his vehicle.

102.    After exiting the vehicle Mr. Harris realized for the first time that the men who had surrounded his vehicle were either security guards or some other authority, as he observed that they were wearing tactical vests.

103.    Upon exiting his vehicle, Mr. Harris put both hands into the air.

104.    Upon exiting his vehicle, Mr. Harris was not armed.

105.    Upon exiting his vehicle, Mr. Harris was not a threat to the men in black ski-masks.

106.    Upon exiting his vehicle, Mr. Harris had not committed a crime.

107.    Upon exiting his vehicle, the men in black ski-masks grabbed, punched, kicked and assaulted Mr. Harris.

108.    During the assault, Mr. Harris' face was slammed into a concrete walkway.

109.   The unrelenting beating Mr. Harris endured continued for approximately 1-2 minutes.

110.   As Mr. Harris was enduring the unprovoked and legally unjustifiable assault, he repeatedly and loudly screamed his cousin's name in a plaintive scream for help.

111.   Other residents in the apartment complex came outside and began to witness the unremitting beating being meted out by the men in black ski-masks.

112.   After the Scorpion Unit's officers noticed witnesses were observing their conduct, they ceased the beating, handcuffed and arrested Mr. Harris.

113.   Totally disregarding Mr. Harris' readily apparent physical injuries, a Scorpion Unit law enforcement officer transported Mr. Harris to the jail located at 201 Poplar Ave., Memphis, Tennessee 38103.

114.   Mr. Harris was bleeding from the head.

115.   Mr. Harris left eye was swollen shut from punches and kicks to the face.

116.   Mr. Harris had great difficulty walking because his right leg was swollen and severely bruised from being stomped and kicked.

117.   Mr. Harris had great difficulty walking because his left leg was gashed from the assault.

118.   But for witnesses coming outside to observe after hearing Mr. Harris' loud screams, Mr. Harris would likely have suffered the same fate as Mr. Nichols.  At a minimum, the assault would have lasted longer and produced more severe injuries.

119.   Upon entering the jail, a nurse or intake specialist observed Mr. Harris' injuries and ordered that he be taken to the hospital.

120.    Mr. Harris was transported to Regional One Hospital, where he received medical treatment.

121.    Following his discharge from Regional One Hospital, Mr. Harris was returned to the jail and booked and processed.

122.    Mr. Harris remained incarcerated for multiple days until his family could round up enough money to bail him out.  Immediately below are photographs which illustrate some of Mr. Harris' facial injuries – taken approximately nine (9) days after his discharge from the hospital:

 

123.    The Scorpion Unit's law enforcement officers falsified an affidavit of complaint which provided a false narrative of the events leading to them approaching Mr. Harris.

124.    The Scorpion Unit's law enforcement officers falsified an affidavit of complaint which failed to mention their assault of Mr. Harris.

125.    The Scorpion Unit's law enforcement officers falsified an affidavit of complaint which included false charges against Mr. Harris, to wit: convicted felon in possession of a handgun, criminal trespass, evading arrest, intentionally evading arrest in an automobile, possession of firearm during a dangerous felony, possession of a controlled substance (and intent to manufacture, distribute/sell), tampering with fabricated evidence and possession of drug paraphernalia.

126.    Defendant Martin, Defendant Mills, Jr., Defendant Smith, and Defendant Haley, Defendant Bean, all of whom were responsible for and participated in the killing of Mr. Nichols, were also the five (5) Scorpion Unit officers who surrounded Mr. Harris' vehicle wearing ski-masks and committed their heinous assault on him just three (3) days before attacking Mr. Nichols.

127.    The Scorpion Unit's entire encounter with Mr. Harris was legally unjustified, unquestionably unconstitutional, and unacceptable in any civilized society.

128.    The unlawful assault will negatively impact Mr. Harris for the rest of his life.

129.    Not only did the Individual Defendants fail Mr. Harris, but so did the Defendant City of Memphis and the policy-makers who are responsible for the licensing and weaponizing the Scorpion Unit for the purpose of using fear and intimidation to violate the rights of citizens.

**F.  City of Memphis' State Action – Deprivation of Civil Rights**

130.    Defendant City of Memphis, by and through the Scorpion Unit's actions in effectuation of its policies, practices or customs, subjected Mr. Harris to a deprivation of his constitutional rights under the Fourth and Fourteenth Amendments, under color of state law.

131.    As a governmental municipality, Defendant City of Memphis is liable to Mr. Harris for the deprivation of his civil rights inflicted by the Scorpion Unit as the latter acted pursuant to its promulgation or adoption of a policy, practice, or custom which directly and proximately caused the events of January 4, 2023 during Mr. Harris' encounter with the Scorpion Unit.

### i.     Ratification of Unconstitutional Policing

132.    Upon information and belief, since its inception in 2021 and prior to January 4, 2023, over ninety percent (90%) of citizens targeted and arrested by the Scorpion Unit have been African-American and/or black men, a ratio far in excess of the black population's representative percentage of the Memphis citizenry.

133.    Upon information and belief, since its inception in 2021 and prior to January 4, 2023, the Scorpion Unit violated the civil and constitutional rights of innumerable young, African-American men in Memphis whom they targeted through baseless traffic stops, false charges, false arrests, creating false pretexts to effectuate violent arrests, false or misrepresentative evidence of alleged crimes, extreme beatings of citizens during the effectuation of arrest, and obfuscation of body worn cameras to conceal violent police behavior during the arrests.

134.    At all times relevant hereto, the conduct of the Scorpion Unit formed a clear pattern of police power in abusing young, African-American men throughout Memphis through the vehicular equivalent of "stop and frisk" tactics which culminated in the foregoing enumerated constitutional abuses.

135.    At all times relevant hereto, Defendant City of Memphis knew or should have known that the Scorpion Unit was continually violating the civil and constitutional rights of young, African-American men in Memphis.

136.    The pattern of the Scorpion Unit's violent assaults on young black men preceding January 4, 2023 included, but was not limited to, the Scorpion Unit's unconstitutional encounters with Damecio Wilbourn and Romelo Hendrix in February 2022, with Dativus Collier and in May

2022, with Sebastian Johnson and Kendrick Johnson Ray in August 2022, and with Maurice Chalmers-Stokes in October 2022.

137.    Upon information and belief, on January 3, 2023, the Scorpion Unit also brutally assaulted another young African-American man while effectuating an arrest, the night before Mr. Harris' encounter.

138.    Upon information and belief, the Scorpion Unit's violent assaults during the effectuation of unlawful arrests since 2021 and before January 4, 2023 number in the thousands.

139.    Despite its knowledge of the Scorpion Unit's pattern of unconstitutional conduct, Defendant City of Memphis never investigated – whether adequately or at all – the Scorpion Unit's violations of citizens' civil and constitutional rights from 2021 to January 4, 2023.

140.    In failing to investigate – whether adequately or at all – the Scorpion Unit's innumerable violations of citizens' rights, Defendant City of Memphis ratified the Scorpion Unit's conduct, which was a moving force of the Scorpion Unit's continuation of its abusive police power.

141.    The foregoing ratification by Defendant City of Memphis directly and proximately caused Mr. Harris to suffer a deprivation of his Fourth and Fourteenth Amendment rights at the hands of the Scorpion Unit and the Individual Defendants on January 4, 2023.

**ii.    Deliberate Indifference – Inadequate Training/Custom of Tolerance**

142.    Upon information and belief, the Scorpion Unit was comprised of law enforcement officers who did not meet typical qualification requirements for joining a specialized unit within the Memphis Police Department, including, but not limited to, possessing violent criminal records, less than five (5) years' experience, and not completing at least the equivalency of an associate's degree in educational or training hours.

143.    Upon information and belief, at all times relevant hereto, Defendant City of Memphis nevertheless hired and retained the law enforcement officers comprising the Scorpion Unit with knowledge that they did not meet the typical qualification requirements for joining a specialized police unit, including, but not limited to, the Individual Defendants.

144.    Upon information and belief, at all times relevant hereto, Defendant City of Memphis further offered waivers of criminal history for law enforcement officers joining the Scorpion Unit.

145.    Upon information and belief, Defendant City of Memphis failed to provide the otherwise unqualified law enforcement officers comprising the Scorpion Unit with adequate training commensurate with the specialized tasks assigned to the Scorpion Unit, including, but not limited to, the Individual Defendants.

146.    At all times relevant hereto, Defendant City of Memphis knew that the unqualified law enforcement officers comprising the Scorpion Unit, including the Individual Defendants, were likely to violate the constitutional rights of its citizens, including, but not limited to, enacting brutal violence on suspects while effectuating their arrests in predominantly African-American neighborhoods.

147.    Defendant City of Memphis' failure to provide any adequate training to the otherwise unqualified law enforcement officers comprising the Scorpion Unit – including the Individual Defendants – was the result of its deliberate indifference to the likely and foreseeable violations of innumerable citizens' constitutional rights by the Scorpion Unit, including, but not limited to, enacting brutal violence on suspects while effectuating their arrests in predominantly African-American neighborhoods.

148.   Defendant City of Memphis' failure to provide any adequate training to the otherwise unqualified law enforcement officers comprising the Scorpion Unit – including the Individual Defendants – actually caused and/or is closely related to the deprivation of Mr. Harris' Fourth and Fourteenth Amendment rights on January 4, 2023.

149.   The foregoing deliberate indifference by Defendant City of Memphis directly and proximately caused Mr. Harris to suffer a deprivation of his Fourth and Fourteenth Amendment rights at the hands of the Scorpion Unit and the Individual Defendants on January 4, 2023.

150.   Upon information and belief, at all times relevant hereto, Defendant City of Memphis knew or should have known of the Scorpion Unit's clear and persistent pattern of illegally violating young black men's civil and constitutional rights while effectuating arrests in predominantly African-American neighborhoods.

151.   Despite its knowledge of the Scorpion Unit's clear and persistent pattern of illegal activity toward citizens, Defendant City of Memphis nevertheless approved of the same in permitting it to continue unceasingly from 2021 until Mr. Nichols' death shone a spotlight on the practices in January 2023.

152.   Defendant City of Memphis' approval of the Scorpion Unit's illegal activity by failing to act to change, terminate or prevent further constitutional abuses by the Scorpion Unit, from 2021 to January 2023, demonstrates its deliberate indifference which amounts to an official policy of inaction.

153.   Defendant City of Memphis' policy of inaction was the moving force and causal link to the deprivation of civil and constitutional rights of innumerable young black men at the hands of the Scorpion Unit, including Mr. Harris on January 4, 2023.

## V. <u>LEGAL CLAIMS</u>

**A. Mr. Harris' Individual Claims Against Defendant City of Memphis for Violation of His Rights Under the Fourth and Fourteenth Amendments**

154. Mr. Harris repeats, re-alleges, and incorporates herein each of the preceding paragraphs as if fully set forth herein.

155. Defendant City of Memphis implicitly or explicitly adopted and implemented policies, procedures, customs, or practices authorizing Memphis Police Department law enforcement officers, including, but not limited to, the Individual Defendants and the Scorpion Unit, in the performance of their official police duties, to assault, use excessive force, unlawfully detain, unlawfully arrest and/or falsely create criminal charges against individuals, such as Mr. Nichols and Mr. Harris, without a legal and/or constitutional justification.

156. Defendant City of Memphis knew, or should have known, that Memphis Police Department law enforcement officers, including, but not limited to, the Individual Defendants and the Scorpion Unit, in the performance of their official police duties, were routinely assaulting, using excessive force, unlawfully detaining, unlawfully arresting and/or falsely charging persons with crimes without a legal and/or constitutional justification.

157. Defendant City of Memphis did not take any actions to stop its Memphis Police Department law enforcement officers, including, but not limited the Individual Defendants and the Scorpion Unit, in the performance of their official police duties, from assaulting, using excessive force, unlawfully detaining, unlawfully arresting and/or falsely creating criminal charges, without a legal and/or constitutional justification, against individuals, such as Mr. Nichols and Mr. Harris.

158. Defendant City of Memphis knew or should have known that, in the absence of a reasonable and appropriate procedure, policy, training, supervision or discipline to deter Memphis

Police Department law enforcement officers, including, but not limited to, the Individual Defendants and the Scorpion Unit, in the performance of their official police duties, from assaulting, using excessive force, unlawfully detaining, unlawfully arresting and/or falsely creating criminal charges against individuals, such as Mr. Nichols and Mr. Harris, citizens would be subjected to unlawful conduct by Memphis Police Department law enforcement officers, specifically the Scorpion Unit and the Individual Defendants.

159.   The failure of Defendant City of Memphis to adequately implement policies and procedures, train, supervise, or discipline Memphis Police Department law enforcement officers, including, but not limited to, the Individual Defendants and the Scorpion Unit, amounts to deliberate indifference to the rights of Mr. Harris, to be free from police assaults, excessive force, and unreasonable seizures under the Fourth and Fourteenth Amendments to the Constitution of the United States.

160.   As a result of the aforementioned policies, procedures, customs, or practices, and deliberate indifference to Mr. Harris' rights, he suffered a deprivation of his constitutional rights and personal injuries and is entitled to relief under 42 U.S.C. §1983.

### i.   Defendant City of Memphis' Failure to Train, Supervise, and Discipline the Scorpion Unit and the Individual Defendants

161. At all relevant times, Mr. Harris did not commit any crime and the Individual Defendants did not have reasonable suspicion, probable cause, or any legally justifiable reason whatsoever to stop him, use force against him, assault him, or arrest him.

162. The force used by the Individual Defendants against Mr. Harris was clearly excessive and was performed in a manner that caused harm to his person when Mr. Harris had

committed no unlawful act and had acted in no way threatening to the life or safety of the Individual Defendants.

163.  From the Scorpion Unit's inception in 2021, the Individual Defendants and other Scorpion Unit officers routinely assaulted, used excessive force during arrests, unlawfully detained, unlawfully arrested, falsified affidavits of complaints, and created false criminal charges against innocent persons, primarily young black men, without legal justification.

164.  Defendant City of Memphis failed to adequately supervise, investigate, and reprimand the Individual Defendants and the Scorpion Unit.

165.  Upon information and belief, the Individual Defendants have been the subject of numerous excessive force and false charge complaints submitted to Defendant City of Memphis and the Memphis Police Department.

166.  Upon information and belief, the Individual Defendants have rarely, if ever, been investigated or disciplined for their unlawful stops, assaults, use of excessive force during arrests, unlawful detentions and arrests, and/or creation of false charges against innocent individuals without legal justification.

167.  Defendant City of Memphis' policies, procedures, and customs pertaining to the investigation and discipline of unlawful stops, assaults, use of excessive force during arrests, unlawful detention and arrests, and/or creation of false charges against innocent individuals without legal justification by law enforcement officers are inadequate to protect civilians from misuse of force.

168.  Defendant City of Memphis had actual and constructive notice that the Individual Defendants routinely performed unlawful stops, assaulted, used of excessive force during arrests,

unlawfully detained and arrested, and/or created false charges against innocent individuals without legal justification.

169.   Defendant City of Memphis had actual and constructive notice that unless adequate hiring, training, supervision and investigation and discipline of complaints against the Individual Defendants and the Scorpion Unit occurred, the Individual Defendants and the Scorpion Unit would continue to undermine the constitutional rights of individuals including, but not limited to, Mr. Harris.

170.   Defendant City of Memphis tolerated, acquiesced, authorized, and sanctioned the actions of the Individual Defendants and the Scorpion Unit.

   ii.   **General Allegations Germane to Defendant City of Memphis' Constitutional Violations**

171.   The above-described actions of the Defendant City of Memphis and the Individual Defendants, in their official capacity, were taken under color of state law and in violation of the rights secured to Mr. Harris by the Fourth and Fourteenth Amendments of the Constitution of the United States.  These rights include, but are not limited to, the right to be free from the excessive use of force, the right to be free from deprivations of liberty, and the right to be free from summary punishment that occur without due process of law.

172.   At all relevant times, Mr. Harris had a right to be free from unconstitutional stops, excessive use of force, the right to be free from deprivations of liberty, the right to be free from summary punishment without due process of law and the right to a fair trial. Each of these rights were clear and well-established at the time of the incidents and facts alleged herein.

173.   At all relevant times herein, Defendant City of Memphis failed to exercise its ability and duty to prevent the acts complained of herein.

174.    Defendant City of Memphis is responsible for the hiring, training, discipline and control of all personnel of the Memphis Police Department, including the Individual Defendants and the Scorpion Unit.

175.    Defendant City of Memphis establishes the Memphis Police Department's policy with respect to the manner in which persons are stopped, arrested, and the use of force permitted when effectuating arrests.

176.    Every law enforcement officer referenced in this Complaint are employees of the Defendant City of Memphis, including, but not limited to, the Individual Defendants and the Scorpion Unit.

177.    Defendant City of Memphis is liable to Mr. Harris because:

(a)      Mr. Harris' rights were violated pursuant to the unconstitutional policies, procedures, customs, or practices, and deliberate indifference referenced herein, whether express or implicit;

(b)      Defendant City of Memphis had actual or constructive knowledge of the same or similar conduct by the Memphis Police Department's employees including the Individual Defendants and the Scorpion Unit, and acted with deliberate indifference regarding same; and

(c)      Defendant City of Memphis failed to act to prevent such misconduct and deprivation of rights which permitted the same to become the policy, procedure, practice and/or custom of the Memphis Police Department.

178.    The remedies available under Tennessee law for redressing the deprivation of Mr. Harris' constitutional rights are inadequate.

179.     The conduct of the Defendants, including, but not limited to, Defendant City of Memphis was willful, malicious, oppressive and/or reckless, and was of such a nature that punitive damages should be imposed in an amount commensurate with the wrongful acts alleged herein.

180.     The Individual Defendants, acted under color of law and in their official capacity, to deprive Mr. Harris of his right to be free from unconstitutional stops, the excessive use of force, the right to be free from deprivations of liberty, the right to be free from summary punishment without due process of law and the right to a fair trial.

181.     As a direct and proximate result of the policies, procedures, customs, and actions of the Defendants, Mr. Harris' constitutional rights were deprived, and he also suffered physical and mental pain and suffering, both past and future. Moreover, Mr. Harris has incurred and will incur medical and psychological expenses, both past and future.

**B.  Mr. Harris' Claims Pursuant to 42 U.S.C. § 1983 Against the Individual Defendants, Individually**

182. Mr. Harris repeats, re-alleges, and incorporates herein each of the preceding paragraphs as if fully set forth herein.

183.     The Individual Defendants individually and under color of law acted willfully, maliciously, unreasonably, recklessly and with deliberate indifference to, and with intentional and wanton disregard of Mr. Harris' constitutional and federally protected civil rights.

184.     The aforesaid conduct of the Individual Defendants was motivated by evil motive or intent and involved willful, reckless and callous indifference to Mr. Harris' constitutional and federally protected rights.

34

185.   A reasonable official in the Individual Defendants' position would have understood that the aforesaid conduct violated the clearly established constitutional and federal rights of Mr. Harris.

186.   By virtue of the foregoing, the Individual Defendants are liable to Mr. Harris, pursuant to 42 U.S.C. § 1983. The Individual Defendants, acting individually and under color of state law, engaged in a course of conduct which caused pain, suffering, and injuries to Mr. Harris, and violated his rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution. These include, but are not limited to, the right to be free from the excessive use of force, the right to be free from deprivations of liberty and the right to be free from summary punishment that occurs without due process of law and the right to a fair trial.

187.   As a direct and proximate result of the actions of Individual Defendants, Mr. Harris suffered deprivation of his constitutional rights, physical and mental pain and suffering, both past and future; and medical and psychological expenses, both past and future.

188.   The Individual Defendants, individually and under color of law acted willfully, maliciously, unreasonably, recklessly and with deliberate indifference to, and with intentional and wanton disregard of Mr. Harris' constitutional and federally protected civil rights.

189.   The aforesaid conduct of the Individual Defendants was motivated by evil motive or intent and involved willful, reckless and callous indifference to Mr. Harris' constitutional and federally protected rights.

190.   A reasonable official in the Individual Defendants' position would have understood that the aforesaid conduct violated the clearly established constitutional and federal rights of Mr. Harris.

35

191.   By virtue of the foregoing, the Individual Defendants are liable to Mr. Harris, pursuant to 42 U.S.C. § 1983. The Individual Defendants, acting individually and under color of state law, engaged in a course of conduct which caused pain, suffering, and injuries to Mr. Harris, and violated his rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution. These include, but are not limited to, the right to be free from the excessive use of force, the right to be free from deprivations of liberty and the right to be free from summary punishment that occurs without due process of law and the right to a fair trial.

192.   As a direct and proximate result of the actions of Individual Defendants, Mr. Harris suffered deprivation of his constitutional rights, physical and mental pain and suffering, both past and future; and medical and psychological expenses, both past and future.

**C.  Civil Assault and Battery**

193.   Mr. Harris repeats, re-alleges, and incorporates herein each of the preceding paragraphs as if fully set forth herein.

194.   The Individual Defendants' conduct as set forth herein was intentional and constitutes civil assault and battery for which they are liable to Mr. Harris.

195.   The Individual Defendants' conduct was in reckless disregard for the safety and well-being of Mr. Harris who was not engaged in criminal activity nor was he genuinely suspected of being engaged in criminal activity at the time of his assault and arrest.

196.   Further, to the extent that the Individual Defendants were acting within the course and scope of their employment when they assaulted and battered Mr. Harris and may claim that they were acting within their discretion, Mr. Harris avers that the Individual Defendants greatly or substantially exceeded their authority and caused him great physical, emotional and mental harm.

197.    The Individual Defendants' conduct is the proximate cause of Mr. Harris' injuries, including physical injuries, great humiliation, mental anguish, mental and emotional distress, extreme embarrassment, fear of loss of employment, damage to his personal and business reputation and standing the community, for which damages are sought.

**D.  False Arrest and Imprisonment**

198.    Mr. Harris repeats, re-alleges, and incorporates herein each of the preceding paragraphs as if fully set forth herein.

199.    The Individual Defendants, acting individually and in concert, knowingly, intentionally and recklessly arrested and imprisoned Mr. Harris against his will, falsely and without just cause and/or probable cause.

200.    The Individual Defendants' conduct was in reckless disregard for the safety and well-being of Mr. Harris who was not engaged in criminal activity at the time of his arrest.

201.    Further, to the extent that the Individual Defendants were acting within the course and scope of their employment when they falsely arrested and imprisoned Mr. Harris and may claim that they were acting within their discretion, Mr. Harris avers that the Individual Defendants greatly or substantially exceeded their authority and caused him physical and mental harm.

202.    The Individual Defendants' conduct is the proximate cause of Mr. Harris' injuries, including physical injuries, great humiliation, mental anguish, mental and emotional distress, extreme embarrassment, fear of loss of employment, damage to their reputation and standing in the community and attorney's fees and expenses related to criminal proceeding, for which damages are sought.

## PRAYER FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** Mr. Harris prays that a jury be empaneled to try the issues raised herein, which are properly triable before a jury of his peers, and prays for a judgment against the Defendants referenced above for the following:

(i)     Compensatory damages awarded to Mr. Harris for both the federal and state court claims in the amount of $5,000,000.00, or an amount the jury may determine just and proper under the circumstances and/or which may be permitted by law;

(ii)    Punitive damages against the Defendants;

(iii)   Attorneys' fees and costs;

(iv)    Pre and post-judgment interest;

(v)     Discretionary costs; and

(vi)    All such further relief, both general and specific, to which Plaintiff may be entitled or to which he may show himself entitled.

Respectfully submitted,

**SPENCE PARTNERS**

By:     /s/ Robert L.J. Spence, Jr.
        Robert L.J. Spence, Jr. (BPR #12256)
        Jarrett M.D. Spence (BPR #34577)
        Andrew M. Horvath (BPR #33862)
        65 Union Avenue, Suite 900
        Memphis, Tennessee 38103
        Office: (901) 312-9160
        Facsimile: (901) 521-9550
        rspence@spencepartnerslaw.com
        jspence@spencepartnerslaw.com
        ahorvath@spencepartnerslaw.com

        *Attorneys for Plaintiff, Monterrious Harris*

38